**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : | |
| **Plaintiff,** | : | |
| **V.** | : | **Case No.** |
| **PAUL THOMAS CROFT, JONATHAN DAVID FROST and MATTHEW WILLIAM DIRA,** | : | |
| **Defendants.** | : | |

# COMPLAINT

Plaintiff, the United States Securities and Exchange Commission (the "Commission" or "SEC"), alleges the following:

## OVERVIEW

1. Between approximately January 2021and September 2023, defendants Paul Thomas Croft ("Croft") and Jonathan David Frost ("Frost") fraudulently offered and sold securities in the form of promissory notes and membership interests in limited liability companies, raising approximately $64 million from over 230 investors.

2. Rather than using the funds for the profit-making activities that were represented to investors, Croft and Frost misappropriated investor funds to meet a variety of their cash needs, such as funding their tax preparation business; paying

exorbitant loan interest and fees to keep the scheme and the tax preparation business operating; making Ponzi-style payments to existing investors; and funding their extravagant lifestyle of travel and luxury automobiles.

3. By the time their scheme collapsed in September 2023, Croft and Frost owed investors approximately $53 million.

4. Defendant Matthew William Dira ("Dira") worked for Croft and Frost as a securities salesperson and administrator. Despite receiving communications warning that Croft and Frost were likely running a Ponzi scheme, Dira continued to sell millions of dollars' worth of promissory notes issued by Croft and Frost's entities, all while earning more than $500,000 salary and commissions.

## VIOLATIONS

5. Defendants Croft and Frost have engaged in acts or practices resulting in violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

6. Defendant Dira engaged in acts or practices resulting in violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)] and Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

7. Unless restrained and enjoined by this Court, Croft, Frost and Dira (collectively "Defendants") will continue to engage in acts and practices that violate these provisions.

**JURISDICTION AND VENUE**

8. The Commission brings this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)] to enjoin Defendants from engaging in the transactions, acts, practices, and courses of business alleged in this complaint, and transactions, acts, practices, and courses of business of similar purport and object, for civil penalties, and for other equitable relief.

9. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act [15 U.S.C. § 77v] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

10. Defendants, directly and indirectly, made use of the mails, and the means and instrumentalities of interstate commerce in connection with the transactions, acts, practices, and courses of business alleged in this complaint. Most notably, many investors transmitted their investment funds via wire transfers, and Defendants frequently communicated with investors via email, texts, or telephone.

11. Venue is proper in this Court under Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain of the transactions, acts, practices, and courses of

business constituting violations of the Securities Act and the Exchange Act occurred in the Eastern District of Tennessee, and because Defendant Frost resides in this district.

## DEFENDANTS

12. **Croft**, age 45, lives in Burr Ridge, Illinois. Croft formerly held Series 6 and 63 securities licenses. He was employed in the securities industry by several different registered investment advisers and/or broker-dealers between 2002 and 2015 as an investment adviser representative and/or registered representative of a broker dealer.

13. **Frost**, age 43, lives in Chattanooga, Tennessee. Frost was a certified public accountant in the State of Tennessee from 2009 until February 2024, when he agreed to have his license permanently revoked. Frost has never been associated with any entity registered with the Commission and has not held any securities licenses. On February 11, 2026, Frost pled guilty to conspiracy to commit wire fraud, conspiracy to commit money laundering, and conspiracy to defraud the United States, based largely on the same conduct as that alleged herein.

14. **Dira**, age 48, lives in Glen Allen, Virginia. Dira was owner and principal of a life insurance agency. Dira formerly held Series 6 and 63 securities licenses. He was employed by several different registered investment advisers and broker-dealers between 2002 and 2013.

## RELATED ENTITY

15. **Croft & Frost, PLLC**, was a Tennessee company based in Chattanooga. It was originally formed in January 2013 by Frost and later merged with an entity owned by Croft. Thereafter, Croft & Frost, PLLC was jointly owned by Croft and Frost. The firm provided accounting and tax preparation services. It ceased operations in September 2023 and was formally dissolved in February 2024.

## THE SECURITIES ISSUERS

16. **Rhino Onward International, LLC** ("Rhino Onward") was an Illinois company based in Chicago. Rhino Onward, which was formed in January 2022 and was co-owned by Croft and Frost, dissolved in July 2024. During the relevant time Defendants offered and sold membership interests in four limited liability companies ("the ROI Funds"), telling investors that the ROI Funds would then lend money to Rhino Onward.

17. **Scorpio Ref, LLC** (the "Scorpio Fund") was an Illinois company owned by Croft and based in Chicago. During the relevant time, Defendants offered and sold notes issued by the Scorpio Fund. The Scorpio Fund dissolved in 2024.

18. **Well Fund LLC** (the "Well Fund") is a Tennessee company formed in June 2020, owned by Frost and two other individuals, and based in Chattanooga. During the relevant period, Defendants offered and sold notes issued by Well Fund.

19. **Taurus LLC** (the "Taurus Fund") was a Minnesota company that Croft formed in January 2021 and solely owned. It was based in Chicago, Illinois. During the relevant period, Defendants offered and sold notes issued by the Taurus Fund. The Taurus Fund was administratively dissolved in 2023.

20. **Gemini Twins, LLC** (the "Gemini Fund") was a Tennessee company formed in June 2022 by Frost. During the relevant period, Defendants offered and sold notes issued by the Gemini Fund. The firm was administratively dissolved in August 2024**.**

21. **Capricorn, LLC** (the "Capricorn Fund") was a Tennessee company formed in June 2022 by Frost. During the relevant period, Defendants offered and sold notes issued by the Capricorn Fund. The firm was administratively dissolved in August 2024.

22. **Chestnut Holdings, LLC** (the "Chestnut Fund") was a Tennessee company formed in December 2015 by Frost. During the relevant period, Defendants offered and sold notes issued by the Chestnut Fund. The firm was administratively dissolved in August 2023.

## FACTUAL ALLEGATIONS

### I. Background and Meeting of Croft, Frost and Dira

23. Croft and Frost met in 2019 via mutual social media connections.

24. At the time, Croft was providing services including insurance, investment and tax planning through a wholly owned entity, while Frost, a CPA, was operating his own accounting and income tax preparation firm in Chattanooga, Tennessee.

25. Croft and Frost eventually combined their tax businesses and formed Croft & Frost, PLLC.

26. Dira met Croft and Frost sometime in 2020.

27. At the time, Dira was selling insurance and providing retirement services. He began referring his clients to Croft & Frost, PLLC for income tax preparation, and eventually was hired by Croft & Frost, PLLC.

28. By 2021, Dira's primary responsibility with Croft & Frost, PLLC was selling promissory notes and membership interests for various the limited liability companies established by Croft and Frost. Dira also provided Croft and Frost with administrative support and managed other sales employees.

## II. **Croft and Frost Sold Securities**

29. From approximately 2021 to September 2023, Croft and/or Frost formed a number of the limited liability companies, or used preexisting entities, (collectively "the Investment Funds") to ostensibly raise capital for various projects.

30. Of the Investment Funds, the Scorpio Fund, the Well Fund, the Taurus Fund, the Capricorn Fund, the Gemini Fund, and the Chestnut Fund issued notes to investors.

31. For the other Investment Fund, Rhino Onward, Defendants sold membership interests in one of four ROI Funds, telling investors that the ROI Funds would then lend money to Rhino Onward.

32. In addition to sales they made directly, Croft and Frost oversaw a team of salespeople who sold promissory notes and membership interests on behalf of the various Investment Funds. Many of these sales agents were, like Dira, employees of Croft & Frost, PLLC.

33. Croft, Frost, Dira and other employees found investors via existing tax clients, Croft's and Dira's life insurance business clients, word-of-mouth referrals from existing clients, and Croft & Frost, PLLC employees' networks of friends and family.

34. In addition to their salaries, Croft & Frost, PLLC employees earned commissions ranging from 1% to 3% on any promissory note sales they brought in.

35. Croft and Frost represented, or directed their salespeople, including Dira, to represent, either orally or via emails, texts or other electronic communications (collectively "written communications"), that the Investment

Funds would use the proceeds from the notes or membership interests for a variety of investments.

36. Croft, Frost, and the salesmen acting at their direction, including Dira, treated the sale of the notes and membership interests as investments and marketed both the notes and membership interests an investment opportunities. In written communications with investors, Defendants and other sales personnel often referred to the purchasers of the notes as "investors."

37. Those individuals who purchased membership interests signed agreements in which they represented that they were an "accredited investor."

38. The promissory notes were offered at different interest rates and terms, and Croft and Frost would promote higher rates of return when they needed money to make interest payments or to fund their lifestyle.

39. Croft and Frost controlled who could invest in the promissory notes and the membership interests, and set the terms, such as the length of the investment period and rate of return.

***A. The Well Fund***

40. Between January 2021 and March 2023, Croft and Frost, either by themselves or through sales personnel acting at their direction, raised over $15 million from more than 70 investors through the sale of promissory notes issued by the Well Fund.

41. The Well Fund notes offered investment returns between 7% and 20% annually with terms between 12 and 60 months.

42. Frost signed most, if not all, of the notes on behalf of the Well Fund.

43. Both Croft and Frost were authorized signatories on the Well Fund's bank account.

44. While the written notes issued by the Well Fund did not specify how the note proceeds would be used, Croft and Frost, or sales personnel acting at their direction, including Dira, told investors, either orally or in written communications, that the Well Fund would use the note proceeds to buy and sell real estate and make small business loans.

45. By July 2021, Croft and Frost ceased using investments in the Well Fund for its stated purposes and instead transferred investor funds to Croft & Frost, PLLC, other Investment Funds and other entities that Croft and Frost controlled.

46. Once transferred, the money was often commingled with funds from other Investment Funds and entities and used for a variety of purposes inconsistent with the stated purpose of the Well Fund, such as repayment of the short-term loans taken out by Croft & Frost, PLLC, employee payroll, interest payments to investors, and personal lifestyle expenses.

***B. The Scorpio Fund***

47. Between April 2022 and May 2023, Croft and Frost raised, either by themselves or through sales personnel acting at their direction, over $25 million from more than 120 investors through the sale of promissory notes issued by the Scorpio Fund.

48. Frost signed most of the promissory notes on behalf of the Scorpio Fund.

49. Both Croft and Frost were authorized signatories on the Scorpio Fund's bank account.

50. The Scorpio Fund's promissory notes offered investment returns up to 360% annually for terms between two and six months.

51. Although the notes issued by the Scorpio Fund did not specify how investor funds would be used, Croft and Frost, or sales personnel acting at their instruction, including Dira, told some investors, either orally or in written communications, that investor funds would be used for real estate acquisition or development, and told other investors that the Scorpio Fund would invest in another investment fund managed by Croft and Frost, Rhino Onward, purportedly to further its attempts to construct a hydrogen power plant.

52. Despite these representations, Croft and Frost diverted the vast bulk of Scorpio Fund investors' funds into Croft & Frost, PLLC's operating accounts.

53. Once in the operating accounts of Croft & Frost, PLLC, the money was commingled with proceeds from other funds and used for a variety of purposes inconsistent with the stated purpose of the Scorpio Fund, such as loan repayment, employee payroll, interest payments to investors, and personal lifestyle expenses.

***C. The Taurus Fund***

54. Between March 2021 and November 2022, Croft and Frost raised, either by themselves or through sales personnel acting at their direction, over $8.5 million from more than 30 investors through the sale of promissory notes issued by the Taurus Fund.

55. Croft signed many notes on behalf of the Taurus Fund and was one of two authorized signatories on the Taurus Fund's bank account.

56. The Taurus Fund notes offered investment returns between 18% and 100% annually for terms between 12 and 96 months.

57. Although the Taurus Fund notes did not specify how the note proceeds would be used, Croft, Frost and the sales personnel acting at their direction, including Dira, represented to most investors, either orally or in written communications, that the money invested in the Taurus Fund would be used to aid a third party's development of a hydrogen power plant.

58. The hydrogen power plant project that Taurus Fund invested in never came to fruition, and all investor funds were lost. Croft and Frost did not disclose the loss of funds to investors.

59. Croft and Frost, and the sales personnel acting at their direction, including Dira, told other investors, either orally or in written communications, that the Taurus Fund would make bridge loans to small businesses. These investors were typically told that the loans would be secured by collateral consisting of a large life insurance policy.

60. Croft orally told at least one investor in or around August 2021 that her funds would be used for a housing project.

61. In or around July 2021, Croft orally told a Taurus investors that Croft had an $8 million life insurance policy that he could liquidate to make investors whole.

62. After investing approximately $5.7 million into the failed hydrogen plant project without any returns, Croft and Frost began directing Taurus Fund funds to other entities controlled by Croft and/or Frost.

63. The redirected Taurus Fund money was commingled with proceeds from other funds and used for a variety of purposes inconsistent with the stated purpose of the Taurus Fund, such as repayment of loans owed by Croft & Frost,

PLLC's, employee payroll, interest payments to investors, and personal lifestyle expenses.

***D. The Capricorn Fund***

64. In June 2022, Frost formed the Capricorn Fund as another means to receive investor funds.

65. To raise funds, the Capricorn Fund issued notes to investors, some of which had a three-year maturity and promised to pay 8% interest.

66. Most if not all of the Capricorn Fund promissory notes were signed by Frost on behalf of that company.

67. Between June 2022 and September 2023, Croft and Frost raised, approximately $1.5 million from around 5 Capricorn Fund investors.

68. Although the Capricorn Fund notes did not specify how the note proceeds would be used, Croft and Frost told investors, either orally or in written communications, that the Capricorn Fund would use the note proceeds to invest in real estate, including residential housing.

69. In fact, Croft and Frost diverted a significant amount of the Capricorn Fund investor money to Croft & Frost, PLLC.

### *E. The Chestnut Fund*

70. Between approximately June 2020 and November 2022, Croft and Frost raised approximately $1.5 million from at least three investors through the sale of promissory notes issued by the Chestnut Fund.

71. The Chestnut Fund notes were mostly signed by Frost, offered to pay interest rates ranging between 10% and 17% per annum, and had maturities ranging between one and three years.

72. Frost and a third party were signatories on the Chestnut Fund bank account.

73. While the Chestnut Fund notes did not specify how the proceeds would be used, Croft and/or Frost told investors, either orally or in written communications, that their money would be used to acquire an apartment building.

74. In fact, Croft and/or Frost diverted a significant amount of the Chestnut Fund investor money to Croft & Frost, PLLC.

### *F. The Gemini Fund*

75. In June 2022, Frost formed the Gemini Fund as another means to receive investor funds.

76. Both Frost and Croft were signatories on the Gemini Fund's bank account.

77. The Form D Notice of Exempt Offering filed on behalf of the Gemini Fund on August 4, 2022, listed both Croft and Frost as executive officers for that entity and stated the none of the funds to be raised pursuant the offering would be paid to the executive officers.

78. The June 2022 operating agreement also listed Croft and Frost as the only officers of the Gemini Fund.

79. To raise funds, the Gemini Fund issued notes to investors, with stated annual interest rates ranging between a low of 12% and a high of 150% or the maximum interest allowed under applicable state law, whichever was lower, and maturities ranging between three and 48 months.

80. Most if not all of the Gemini Fund promissory notes were signed by Frost on behalf of that company.

81. Between February and September 2023, Croft and Frost raised approximately $3 million from at least five Gemini Fund investors.

82. Although the Gemini Fund notes did not specify how the proceeds would be used, Croft and Frost told some investors, either orally or in written communications, that proceeds from the Gemini Fund notes would be used either to develop a hydrogen power plant or for lending to small businesses.

83. In fact, Croft and Frost diverted a significant amount of the Gemini Fund investor money to Croft & Frost, PLLC.

### *G. Rhino Onward*

84. In early 2022, Croft and Frost formed Rhino Onward purportedly to construct and operate their own hydrogen power plant, notwithstanding the fact that neither of them had any knowledge or expertise in the hydrogen power industry.

85. Between December 2022 and July 2023, Croft and Frost, either by themselves or through sales personnel acting at their direction, including Dira, raised over $8.7 million from more than 50 investors for Rhino Onward.

86. Croft and Frost were both authorized signatories on Rhino Onward's bank account.

87. Each Rhino Onward investor signed a "Membership Interest Purchase Agreement," pursuant to which the investor purchased a membership interest in one of four ROI Funds.

88. The Membership Agreements, which were typically signed by Frost on behalf of the ROI Fund, represented that the ROI Fund was created to fund a $10,000,000 loan to Rhino Onward.

89. Croft, Frost, or their sales personnel acting at their direction, including Dira, represented to investors, both orally and in written communications, that Rhino Onward was formed to develop a hydrogen power plant.

90. The Membership Agreements stated that each ROI Fund was governed by an operating agreement.

91. The operating agreement for each ROI Fund stated that that ROI Fund was formed "to generate a one-time profit from funding a ten million dollar ($10,000,000) equity infusion . . . for [Rhino Onward]," and stated that the ROI Fund "shall not engage in any business activity not necessary or incidental to such purpose."

92. Although the operating agreements provided that each ROI Fund would be managed by all members acting unanimously, the agreements further specified the members could delegate the responsibility for the day-to-day management responsibilities to an Operating Manager, and that Frost was appointed as the initial Operating Manager.

93. The operating agreements further provided that a majority of the members had to approve any transaction by the company that was out of the ordinary course of business.

94. In practice, however, investors were not given an opportunity to vote on any business conducted by the ROI Funds, and members did not otherwise exercise any control over them, their business or the related investments.

95. Croft and Frost maintained complete control over the ROI Funds' business activities and bank accounts.

96. Under their direction, Rhino Onward took no substantial steps towards constructing a power plant.

97. Croft and Frost transferred nearly all of the investor funds raised by the ROI funds for Rhino Onward to Croft & Frost, PLLC to be used for payroll or loan payments.

## III. <u>Croft and Frost Misappropriate Investor Funds</u>

98. Almost immediately after starting to receive investor funds, Croft and Frost began to use those funds for purposes other than those represented to investors.

99. Croft and Frost repeatedly transferred investor funds between the bank accounts of the various Investment Funds, effectively treating the funds as undifferentiated, and investor money as fungible and available for any pending cash need.

100. In total, of the approximately $64 million that Croft and Frost raised from investors, at least $53 million was used contrary to the purposes Croft, Frost or the sales personnel had touted to investors.

101. Croft and Frost funneled almost $33 million of investor funds to Croft & Frost, PLLC to pay employees' salaries and commissions, and finance their lavish lifestyles.

102. Between 2021 and 2023, Croft and Frost misappropriated approximately $11 million of investor funds for their direct personal benefit.

103. They made these payments to themselves via regular payroll and direct transfers from the investment funds.

104. Croft used these payments to acquire multiple exotic cars such as a Maserati and a Ferrari, and personal residences in Chicago and Miami.

105. Additionally, Croft and Frost both used investor funds to pay off their personal credit card bills, which they used for expensive purchases, such as custom suits, jewelry, private flights, yacht charters, and luxury goods.

106. Croft and Frost never told investors that they were receiving direct compensation. On the contrary, Frost told investors that Croft and Frost were somehow being compensated via their equity ownership in the various Investment Funds.

107. The operating agreements for the ROI Funds stated that no management fee would be paid to any member for their services managing the company unless 75% of all members agreed upon such compensation.

108. The members of the ROI Funds never gave the requisite approval for payment of any management fees to either Croft or Frost.

109. In addition, because none of the Investment Funds earned material returns, Croft and Frost regularly used new investor funds to pay previous investors' monthly returns and return of principal.

110. These Ponzi-style payments accounted for a cumulative total of approximately $10 million in misused investor funds.

111. Croft and Frost's reckless spending often exceeded the tens of millions of dollars they were bringing in via new investments.

112. When they did not raise enough funds from investors in any given month, Croft and Frost would take out short-term, high-interest rate loans.

113. Croft and Frost used the loan proceeds to cover these cash flow shortages.

114. These loans were usually repayable within a few months and required daily payments equal to roughly 1% to 5% of the loan principal.

115. The daily principal and interest payments on these short-term loans were almost exclusively funded by investor funds.

116. Croft and Frost regularly communicated with each other regarding the misuse of investor funds.

117. For example, in response to an April 2022 text from Frost about the need to "hit[] the pavement again" to raise investor funds for the Scorpio Fund, Croft responded "I though [sic] you raised around $2.1 MM recently??!"

118. Frost responded, "Yes but that's for us bro :)", to which Croft replied with the love emoji.

119. Around the same time, Frost texted Croft that Frost "had to move another $100,000 from the Well Fund to [Croft & Frost, PLLC] to cover cash needs for Monday."

120. In June 2022, Frost texted Croft that Frost had to send $120,000 from the Scorpio Fund to the Taurus Fund to pay Croft's employees and to pay interest on Taurus Fund's promissory notes.

## V. **<u>Dira Continued Selling Securities Despite Warnings about the Misuse of Investor Funds</u>**

121. As an employee of Croft & Frost, PLLC, Dira sold promissory notes and membership interests in the ROI Funds from at least 2021 to 2023.

122. In addition to selling, Dira managed and trained other salespersons.

123. During that time Dira also performed administrative tasks such as keeping track of investor payments and helping organize and maintain investor paperwork.

124. Between 2021 and 2023, Croft and Frost paid him at least $500,000 in salary and commissions.

125. In September 2022, Dira received emails suggesting that Croft and Frost were paying investor returns using new investor money.

126. Specifically, in emails dated September 12 and 13, 2022, Frost responded to Dira's request for approval to pay certain investors by writing in pertinent part "[l]et's wait until we raise more[,]" and "we need to raise more to [repay an investor]."

127. Around the same time, Dira began receiving complaints from investors who were not receiving their principal and interest payments.

128. Dira nevertheless continued to sell to new investors, repeating the same representations as before about how investment funds would be utilized, without disclosing that he had reason to doubt how new investor funds were being used.

129. Dira, after learning that prior investors were likely being paid with new investor funds, also continued to help administer the funds, including rolling over investors from the Taurus Fund, after it became clear the third party would not develop the hydrogen power plant, to another Investment Fund.

130. Dira also continued to receive $235,732 in salary and commissions after the September 13, 2022 email.

## VI. <u>The Scheme Collapsed when Croft and Frost Ran Out of New Investor Funds</u>

131. Beginning in December 2022, Croft and Frost began experiencing cash flow problems due to slowing note sales.

132. Despite collecting millions of dollars from investors and receiving millions through high-interest short-term loans, it cost still more to cover Croft & Frost, PLLC's operating expenses, to make principal and interest payments on the short-term loans, and to fund their lifestyles.

133. By August 2023, Croft and Frost could no longer make necessary payments or their payments to investors.

134. In September 2023, Croft & Frost, PLLC abruptly stopped doing business and laid off all its employees, and all of the investment funds effectively closed.

## COUNT I – FRAUD

### Violations of Section 17(a)(1) of the Securities Act
### [15 U.S.C. § 77q(a)(1)]

### (Defendants Croft and Frost)

135. Paragraphs 1 through 134 are hereby realleged and incorporated herein by reference.

136. As alleged in paragraphs 15 – 120, between January 2021 and September 2023, Defendants Croft and Frost, in the offer and sale of the securities described herein, by the use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly, employed devices, schemes and artifices to defraud purchasers of such securities; all as more particularly described above.

137. While engaging in the course of conduct, or in making the misrepresentations or omissions described above, Defendants Croft and Frost acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severely reckless disregard for the truth.

138. By reason of the foregoing, Defendants Croft and Frost, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II – FRAUD

### Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]

### (Defendants Croft and Frost)

139. Paragraphs 1 through 134 are hereby realleged and incorporated herein by reference.

140. As alleged in paragraphs 15 – 120, between January 2021 and September 2023, Defendants Croft and Frost, in the offer and sale of the securities described herein, by use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly:

a. obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading; and

b. engaged in transactions, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities; all as more particularly described above.

141. While engaging in this conduct, Defendants Croft and Frost acted at least negligently.

142. By reason of the foregoing, Defendants Croft and Frost, directly and indirectly, have violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT III – FRAUD

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]**

**(Defendants Croft and Frost)**

143. Paragraphs 1 through 134 are hereby realleged and incorporated herein by reference.

144. As alleged in paragraphs 15 – 120, between January 2021 and September 2023, Defendants Croft and Frost, in connection with the purchase and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

a. employed devices, schemes, and artifices to defraud;

b. made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c. engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities; all as more particularly described above.

145. While engaging in such conduct, Defendants Croft and Frost acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severely reckless disregard for the truth.

146. By reason of the foregoing, Defendants Croft and Frost, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**COUNT IV**

**Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act**
**[15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]**

**(Defendant Dira)**

147. Paragraphs 1 through 134 are hereby realleged and incorporated herein by reference.

148. As alleged in paragraphs 121-130, between at least September 2022 and September 2023, Defendant Dira, in the offer and sale of the securities described

herein, by use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly:

a. obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

b. engaged in transactions, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities; all as more particularly described above.

149. While engaging in such conduct, Defendant Dira acted at least negligently.

150. By reason of the foregoing, Defendant Dira, directly and indirectly, has violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT V

## ACTING AS AN UNREGISTERED BROKER

**Violation of Section 15(a)(1) of the Exchange Act**
**[15 U.S.C. § 78o(a)(1)]**

**(Defendant Dira)**

151. Paragraphs 1 through 134 are hereby realleged and incorporated herein by reference.

152. As alleged in paragraphs 10, 28, 33-37, 47, 51, 54, 57, and 82, Defendant Dira made use of the mails or other means or instrumentalities of interstate commerce to engage in the business of effecting transactions in, or to induce or to attempt to induce the purchase or sale of securities for the account of others without being either registered with the Commission as a broker or being associated with an entity registered with the Commission as a broker.

153. By reason of the foregoing, Defendant Dira violated and, unless enjoined, will continue to violate, Section 15(a)(1) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Defendants Croft and Frost and their agents, employees, and attorneys, and any other person or entity in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], by committing or engaging in specified actions or activities relevant to such violations;

**II.**

Permanently enjoining Defendants Croft, Frost and Dira and their agents, employees, and attorneys, and any other person or entity in active concert or participation with any of them who receive actual notice of the injunction by personal service or otherwise from directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Defendants from purchasing or selling securities for his own personal accounts;

**III.**

Permanently enjoining Defendants Croft and Dira and their agents, employees, and attorneys, and any other person or entity in active concert or participation with either of them who receive actual notice of the injunction by personal service or otherwise, from, directly or indirectly, acting as or being associated with any broker, dealer, or investment adviser.

**IV.**

Permanently enjoining Defendant Dira and his agents, employees, and attorneys, and any other person or entity in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, from violating Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2)

and 77q(a)(3)], by committing or engaging in specified actions or activities relevant to such violations, and from violating Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)];

**V.**

Ordering each Defendant to disgorge all ill-gotten gains they received directly or indirectly from the activities set forth in this Complaint, with pre-judgment interest thereon, pursuant to Sections 21(d)(3), (d)(5) and (d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

**VI.**

Ordering each Defendant to pay a civil penalty pursuant to Section 21(d) of the Exchange Act [15 U.S.C. §78u(d)] and Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)]; and

**VII.**

Granting such other and further relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

**JURY TRIAL DEMAND**

The Commission hereby demands a trial by jury as to all issues that may be so tried.

This 11th day of September, 2026.

Respectfully submitted,

*/s/ M. Graham Loomis*
M. Graham Loomis
Regional Trial Counsel
Georgia Bar No. 457868
loomism@sec.gov

Paul T. Kim
Senior Trial Counsel
Georgia Bar No. 418841
kimpau@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
950 East Paces Ferry Road, NE, Suite 900
Atlanta, GA 30326
Tel: (404) 842-7600
Facsimile: (404) 842-7679